*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CARICO/SMITH, Minors.

UNPUBLISHED
December 17, 2025
11:26 AM

No. 376009
Hillsdale Circuit Court
Family Division
LC No. 24-000805-NA

Before: RIORDAN, P.J., and GARRETT and MARIANI, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order assuming jurisdiction over the minor children, SC, LC, JC, AS1, and AS2, under MCL 712A.2(b)(1) (failure to provide proper care and custody due to neglect) and (b)(2) (unfitness of parental home). We affirm.

## I. BACKGROUND

In December 2024, the Department of Health and Human Services (DHHS) filed a petition requesting that the trial court exercise jurisdiction over the children—who ranged in age from approximately 14 years old to a few weeks old—and remove them from respondent's care.[1] DHHS alleged substance abuse by respondent, as well as neglect by respondent toward the children. DHHS alleged that AS2, who had been prematurely born a few weeks prior, had been born positive for methamphetamine and tetrahydrocannabinol (THC), and that respondent admitted to drug use, including while pregnant with AS2. DHHS also alleged that respondent failed to take AS2 to medical appointments following her birth and that AS2 was eventually admitted to the hospital because she had lost nearly a pound due to insufficient feedings and had developed various infections. Regarding the other children, DHHS alleged that AS1 had serious dental issues that had been left untreated; SC had cuts on her arm that appeared to be self-inflicted; JC, who had a

---

[1] The legal father of LC, JC, AS1, and AS2 was initially named as a respondent in the petition but was subsequently removed as one later in the proceedings. The legal father of SC was deceased at the time that DHHS filed the petition. Neither is a party to this appeal.

rare degenerative condition, had not been taken to doctors in Michigan;[2] and LC and SC were truant. DHHS also alleged unsafe living conditions, particularly as it related to AS2, stating that respondent, on multiple occasions, had left AS2 unattended as AS2 slept on loose blankets.

The trial court issued an ex parte order immediately removing AS2 from respondent's custody and placing her into protective custody under the supervision of DHHS, and the court conducted an emergency removal hearing to determine whether removal of the other children was appropriate. Following that hearing, the court determined that removal was necessary because respondent's home environment presented a substantial risk of harm to the children's lives, physical health, and mental well-being. JC, LC, and AS1 were placed in their father's care, and SC was placed in a foster home under the supervision of DHHS.[3] Following a preliminary hearing regarding the alleged circumstances, the trial court authorized the petition.

The trial court presided over a nine-hour adjudication bench trial in April 2025. During the trial, the court received voluminous documentary evidence and testimony from numerous witnesses, several of whom were qualified as expert witnesses, regarding the alleged facts and circumstances that gave rise to DHHS's petition. At the close of proofs, the court concluded that a preponderance of the evidence supported the exercise of jurisdiction under MCL 712A.2(b)(1) and (2). The court thereafter entered an order of adjudication assuming jurisdiction over all five children that was consistent with the court's findings on the record and, following a dispositional hearing, entered an initial dispositional order requiring respondent to comply with a case service plan provided by DHHS. This appeal followed.

## II. DISCUSSION

Respondent argues that the trial court clearly erred by exercising jurisdiction over the children because DHHS failed to establish a statutory basis for jurisdiction. "Whether a trial court can assert jurisdiction over a child protective proceeding is a question of law that we review de novo." *In re Hull*, 345 Mich App 562, 567; 7 NW3d 114 (2023). "Challenges to the court's decision to exercise jurisdiction are reviewed for clear error in light of the court's finding of fact." *In re Boshell/Shelton*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371973); slip op at 3 (quotation marks and citation omitted). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due

---

[2] Respondent and the children had intermittently lived in Michigan and in Indiana with respondent's parents.

[3] After the removal hearing, JC was immediately released to his father due to the father's experience caring for JC's extensive needs for nearly JC's entire life. SC, LC, and AS1, meanwhile, were initially placed in a temporary foster home. LC and AS1 subsequently joined JC in their father's care, where they remained for the remainder of the proceedings, but SC remained in a foster home throughout the proceedings because she was not related to the other children's father and expressly stated that she preferred to remain in a foster home rather than be placed in his care.

regard to the trial court's special opportunity to observe the witnesses." *Id*. at ___; slip op at 3 (quotation marks and citation omitted).

To properly exercise jurisdiction, the trial court must find, by a preponderance of the evidence, that at least one statutory basis for jurisdiction under MCL 712A.2(b) exists. *Id*. at ___; slip op at 2-3. "A preponderance of the evidence is evidence that, when weighed with that evidence opposed to it, has more convincing force and the greater probability of truth." *Id*. at ___; slip op at 3 (cleaned up). When determining whether jurisdiction exists, "the trial court must examine the child's situation at the time the petition was filed because MCL 712A.2(b) speaks in the present tense." *In re Leach*, 347 Mich App 26, 32; 14 NW3d 178 (2023) (cleaned up).

A court may exercise jurisdiction over a child under MCL 712A.2(b)(1) when the child's parent, "when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals," or when the child "is subject to a substantial risk of harm to his or her mental well-being[.]" The court may exercise jurisdiction over a child under MCL 712A.2(b)(2) when the child's "home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent . . . is an unfit place for the juvenile to live in." For both jurisdictional bases, "neglect" means:

> harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care. [MCL 722.602(1)(d); see also MCL 712A.2(b)(1)(B) and (b)(2).]

As noted, at the conclusion of the adjudication bench trial, the trial court in this case concluded that DHHS established by a preponderance of the evidence that statutory grounds for jurisdiction existed under MCL 712A.2(b)(1) and (2). The court found that, although respondent was able to provide proper care for her children and had done so in the past, she had relapsed into methamphetamine use and, as a result, had neglected her children's needs. The court found that respondent neglected AS2's medical needs, emphasizing that AS2 had lost "a significant amount of weight" and developed infections in the weeks following her birth, but respondent had repeatedly failed "to get [AS2] to the additional appointments that she needed." The court also found that there was "just no question" that respondent neglected SC's and LC's educational needs, noting that both children were "legally truant" based on the significant number of school days they had missed in the 2024 fall semester. The court found that while respondent did not make "a bad choice by having [SC] help" care for the other children, it was not appropriate for 14-year-old SC to act as "the primary" parent for an extended period of time, particularly at the expense of her own educational needs.

The trial court also found that respondent's home environment was an unfit place for the children to live due to respondent's criminality and neglect of AS2's, SC's, and LC's needs. The court found that respondent's neglect of SC's and LC's educational needs also constituted "criminality" because, although respondent "wasn't charged," it was a criminal "misdemeanor . . . for not making sure your children are in school." The court also found that "there [wa]s zero question that [respondent] was using methamphetamine" because the documentary and testimonial

evidence clearly established that respondent had used methamphetamine while pregnant with AS2 and had tested positive for methamphetamine in the months preceding the adjudication trial. The court further found—by nearly "clear and convincing" evidence given "the level of experts in terms of testimony"—that respondent's drug use presented a substantial risk of harm to all of the children. The court stated that it was "concerned significantly" about AS2's safety because, although an average parent "might be able to . . . keep[] a close eye on [his or her] baby" when the baby is loosely wrapped in blankets, those "unsafe sleep . . . practices" coupled with "an individual who is testing positive for substances" is "a recipe for disaster." The court was also very concerned about the children's "unintentional exposure to possible methamphetamine" because respondent was using methamphetamine and there was evidence of drug use found in respondent's basement. The court also stated that it was "leaning heavily on the fact [that] evidence of how one child is treated in the State of Michigan is used as how evidence [sic] of all children are treated."

The record is consistent with these findings. Regarding respondent's medical neglect of AS2, testimony and medical reports established that respondent had not received any prenatal care until she was 29 weeks pregnant and that AS2 had been born premature at 36 weeks with methamphetamine and THC in her system. Multiple witnesses, including respondent, testified that she had missed at least three follow-up appointments for AS2 scheduled after her birth. The documentary and testimonial evidence also established that, during the weeks of these missed appointments, AS2 had lost nearly one pound, which was a concerning amount of weight for a newborn. Respondent's friend testified that, when she visited respondent's home a few weeks after AS2's birth, AS2 "had a grayish tinge to her skin" and "didn't act like a normal baby." AS2's weight loss and unhealthy appearance resulted in a "failure to thrive diagnosis" and required AS2 to be readmitted to the hospital for close observation and treatment. AS2's treating physicians testified that AS2's weight loss was due to insufficient feedings and that she was able to regain the weight she had lost when she was consistently fed each day.

Regarding the unsafe home environment and safe-sleep concerns related to AS2, respondent's friend testified that, during her visit with respondent and AS2, respondent "was around" but had "just sat [AS2] on the couch" on top of a loose throw blanket. The Children's Protective Services (CPS) investigator involved in this case similarly testified that she had observed AS2 lying on loose blankets on the couch while respondent was "outside smoking a cigarette" where "[i]t wouldn't have been possible" for her to see AS2. The CPS investigator had also determined that AS2 was typically sleeping in a wooden bassinet filled with loose blankets, which was "not [a] safe sleep" practice because AS2 could become tangled in the blankets.

Regarding respondent's educational neglect of LC and SC, secretaries at LC's and SC's schools testified that students were reported as truant if they missed more than 10 days in any given semester and that LC and SC had, respectively, missed 13 days and 25 days of school in the 2024 fall semester. Respondent's friend, who had temporarily cared for some of the children after their removal, testified that SC "was kept out of school several times" to care for JC and AS1. SC also testified that she began missing school after AS2 was born to help care for her siblings because respondent and the children "didn't have enough stability at that point . . . to take care of a newborn baby on [their] own." Although respondent testified that SC was enrolled in an online Indiana school during this time, there was no testimony or documentary evidence demonstrating that SC was enrolled in that school, and the secretary at SC's Michigan school testified that SC was still enrolled there at the time of the adjudication trial. The CPS investigator testified that she

confirmed that SC was not enrolled in an online school and that even if she was, she did not have a laptop to participate in an online school.

Finally, regarding respondent's drug use, the father of LC, JC, AS1, and AS2 testified that, while visiting respondent's home, he found some foil with a substance on it that he believed was methamphetamine in respondent's basement, and the CPS investigator testified that respondent "would not allow access to" the basement during a house visit. There was testimony that the children typically did not go into the basement, but there was no testimony indicating that the children were forbidden from doing so, and the children's former babysitter testified that the basement was generally accessible to them. Indeed, SC testified that the only room in the house that she and her siblings were not allowed to enter was their "grandparents' room," which was locked to prevent them from entering. Respondent's friend testified that she believed that respondent had been using methamphetamine since around the time of AS2's birth because, as a former methamphetamine user, she "used to have the same mannerisms" that respondent was exhibiting at that time, including extreme agitation, "biting her cheek," and "constant[ly] moving . . . her jaw." And although respondent denied using methamphetamine before, during, or after AS2's birth, the CPS investigator testified that respondent had admitted to using THC and methamphetamine around that time. Additionally, expert testimony and toxicology reports established that AS2 had been born positive for methamphetamine and THC on November 24, 2024, and that respondent had tested positive for methamphetamine on January 16, 2025, and again on March 6, 2025, which was approximately six weeks before the adjudication trial.

Although the trial court's findings regarding medical neglect were related to AS2 and its findings regarding educational neglect educational neglect were related to LC and SC, the court believed that this neglect was largely due to respondent's drug use and, as a result, that JC and AS1 would also be neglected if left in respondent's care.[4] "[T]he doctrine of anticipatory neglect allows an inference that a parent's treatment of one child is probative of how that parent may treat other children" such that the doctrine "may apply to confer jurisdiction." *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020). Although the children varied in age and therefore varied in needs, see generally *id.*, all of the children lived with respondent in her home and exclusively relied on her for all of their needs. And although the court was unwilling to expressly find that respondent had neglected JC's and AS1's medical needs, there was still testimony establishing: that AS1 had significant dental issues impacting her ability to eat, as well as what appeared to be a thrush infection in her mouth, for which respondent had not sought treatment; that respondent often relied

---

[4] Respondent argues on appeal that drug use alone, without any evidence of harm to the children, is an insufficient basis for a court to assume jurisdiction over child. See *In re Richardson*, 329 Mich App 232, 255; 961 NW2d 499 (2019) (stating that, in the context of termination of parental rights, there must be facts in the record sufficiently demonstrating that the parent's drug use is "actually harming or presenting an articulable risk of harm to the child"). As discussed above, however, the trial court in this case did not assume jurisdiction based solely on the fact of respondent's drug use. Rather, as the trial court found, respondent's drug use directly impaired both her ability to parent and the children's health and well-being, resulting in neglect as well as AS2 being born with THC and methamphetamine in her system.

on then-13-year-old SC to care for JC, who was nonverbal and required a specific diet and an at-home physical therapy routine due to his degenerative condition; and that, shortly after JC was removed from respondent's care, he refused to eat anything other than unhealthy foods that were outside of his specific diet. Thus, the doctrine of anticipatory neglect further supports the trial court's exercise of jurisdiction over all the children. See *id*.

Resisting this conclusion on appeal, respondent emphasizes portions of the record evidence that she believes weigh against the assumption of jurisdiction. The trial court, however, was tasked with determining, based on the entirety of the record before it, whether a preponderance of the evidence established at least one statutory basis for jurisdiction. *Boshell/Shelton*, ___ Mich App at ___; slip op at 2-3. For the reasons discussed, ample record evidence supported the trial court's determination that jurisdiction over the children was warranted under MCL 712A.2(b)(1) and (2), and respondent has failed to show reversible error in that determination.[5]

Affirmed.

/s/ Michael J. Riordan
/s/ Kristina Robinson Garrett
/s/ Philip P. Mariani

---

[5] In finding that assumption of jurisdiction under MCL 712A.2(b)(2) was warranted, the trial court observed that respondent had exposed the children to domestic violence in her home. Although the record reflects that LC reported that she had, on multiple occasions, witnessed her father and respondent engaged in instances of domestic violence against each other while SC kept JC and AS1 upstairs, the record also reflects that LC's father moved out of respondent's home in March 2024 and that no domestic-violence incidents between them occurred after then. There was also no evidence that respondent engaged in domestic violence with any of the children or any other romantic partner she may have had since that time. It is thus clear from the record that respondent's home had been free of domestic violence for approximately nine months at the time that DHHS filed its petition in December 2024. Because the children were not exposed to domestic violence at the time that the petition was filed, it was error for the court to rely on these instances of domestic violence as a basis for its findings under MCL 712A.2(b)(2). See *Leach*, 347 Mich App at 32. For the reasons discussed above, however, the trial court's other findings under MCL 712A.2(b)(1) and (2) were more than adequate in themselves to support the court's assumption of jurisdiction, rendering this error harmless. See MCR 3.902(A); MCR 2.613(A).